RECORD NO. 13-4955

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSE JOAQUIN MORALES,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

**OPENING BRIEF OF APPELLANT
JOSE JOAQUIN MORALES**

Jonathan S. Zucker
LAW OFFICE OF JONATHAN ZUCKER
Suite 202
1350 Connectivut Avenue, NW
Washington, DC 20036
(202) 624-0748
jonathanzucker@aol.com

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

STATEMENT OF JURISDICTION ........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................1

STATEMENT OF THE CASE ...............................................................2

STATEMENT OF RELEVANT FACTS .................................................3

SUMMARY OF THE ARGUMENT ....................................................10

ARGUMENTS ....................................................................................12

    I.      DEFENDANT WAS DENIED FUNDAMENTAL FAIRNESS
           BY TESTIMONY OF GOVERNMENT WITNESS ENRIQUE
           PABON .......................................................................................12

           A.      Standards of Review.................................................13

           B.      Introduction of Defendant's Statements Breached the
                  Proffer Agreement Violating Principles of Due Process
                  and Fundamental Fairness.........................................13

           C.      Alternatively, the District Court Clearly Erred in Failing
                  to Strike Pabon's Testimony As a Sanction for Violating
                  the Jencks Act By Destroying His Detailed Notes ..................18

    II.     IMPROPER    REBUTTAL    ARGUMENTS    DENIED
           DEFENDANT A FAIR TRIAL .........................................................20

           A.      Legal Standards .......................................................21

           B.      Arguments Were Improper.........................................21

                    1.      Implying Guilt from Defendant's Request to be
                            "Under Proffer" Penalized His Fifth Amendment
                            Right to Remain Silent ..................................21

i

2.    Inflammatory Character Argument Based on the Absence of Evidence that the Government Had Dissuaded the Defense From Introducing Was Plainly Improper ............................................................25

3.    Falsely Disparaging Defense Counsel For Making an Improper Argument Misled The Jury ........................28

C.    Improper Rebuttal Arguments Prejudicially Affected Defendant's Substantial Rights And Deprived Him of a Fair Trial .................................................................................30

III.    CUMULATIVE EFFECT OF ERRONEOUS EVIDENTIARY RULINGS AND IMPROPER REBUTTAL ARGUMENTS DENIED DEFENDANT A FAIR TRIAL ..........................................33

CONCLUSION ....................................................................................34

REQUEST FOR ORAL ARGUMENT ....................................................35

CERTIFICATE OF COMPLIANCE ........................................................36

CERTIFICATE OF SERVICE ...............................................................37

## TABLE OF AUTHORITIES

### CASES

Page

*Arizona v. Fulminante*,
99 U.S. 279 (1991)........................................................................17

*Bagley v. Combs,*
531 U.S. 1035 (2000)...............................................................23, 24

*Berger v. United States*,
295 U.S. 78 (1935)........................................................................34

*Combs v. Coyle*,
205 F.3d 269 (6th Cir.2000) *cert. denied, Bagley v. Combs,* 531 U.S.
1035 (2000)..........................................................................23, 24

*Coppola v. Powell*,
878 F.2d 1562 (1st   Cir.1989) *cert. denied,* 493 U.S. 969 (1989) ................23

*Ferrara v. United States*,
456 F.3d 278 (1st Cir.2006)........................................................17

*Griffin v. California*,
380 U.S. 609 (1965)......................................................................22

*Hoffman v. United States*,
341 U.S. 479 (1951).......................................................................23

*Mallory v. Hogan*,
378 U.S. 1 (1964).........................................................................21

*Michelson v. United States*,
335 U.S. 469 (1948).......................................................................27

*In re Murchison*,
349 U.S. 133 (1955).......................................................................33

*Old Chief v. United States*,
519 U.S. 172 (1997).......................................................................31

iii

*Quinn v. United States,*
 49 U.S. 155 (1955)........................................................................................23

*Salinas v. Texas, \_\_\_U.S.\_\_\_,*
 133 S. Ct. 2174 (2013)..........................................................................22, 23

*United States v. $87,118.00 in U.S. Currency,*
 95 F.3d 511 (7th Cir. 1996) ...........................................................................14

*United States ex rel. Savory v. Lane,*
 832 F.2d 1011 (7th Cir.1987) ...................................................................24, 25

*United States v. Anderson,*
 933 F.2d 1261 (5th Cir.1991) .........................................................................27

*United States v. Baker,*
 432 F.3d 1189 (11th Cir. 2005) ................................................................33, 34

*United States v. Burson,*
 952 F.2d 1196 (10th Cir.1991) *cert. denied,* 503 U.S. 997(1992) .................24

*United States v. Caro,*
 597 F.3d 608 (4th Cir. 2010) .........................................................................32

*United States v. Carrasco,*
 537 F.2d 372 (9th Cir. 1976) ...................................................................19, 20

*United States v. Collins,*
 415 F.3d 304 (4th Cir.2005) ..........................................................................21

*United States v. Crowell,*
 586 F.2d 1020 (4th Cir. 1978) .......................................................................19

*United States v. Derrick,*
 507 F.2d 868 (4th Cir.1974) ..........................................................................18

*United States v. Earle,*
 375 F.3d 1159 (D.C. Cir. 2004).....................................................................27

*United States v. Gillion*,
    704 F.3d 284 (4th Cir. 2012) *cert. denied,* 133 S. Ct. 2039, 185 L. Ed.
    2d 888 (U.S. 2013) ....................................................................13, 14

*United States v. Godwin*,
    272 F.3d 659 (4th Cir. 2001) ................................................34

*United States v. Hill*,
    643 F.3d 807 (11th Cir. 2011) ..............................................14

*United States v. Hinton*,
    719 F.2d 711 (4th Cir. 1983) ................................................18

*United States v. Lopez*,
    219 F.3d 343 (4th Cir. 2000) ................................................13

*United States v. Martinez*,
    277 F.3d 517 (4th Cir.2002) .................................................34

*United States v. Melvin*,
    730 F.3d 29 (1st Cir. 2013) .............................................14, 17

*United States v. Mendoza*,
    522 F.3d 482 (5th Cir. 2008) ................................................27

*United States v. Mitchell*,
    1 F.3d 235 (4th Cir. 1993) ....................................................21

*United States v. Okatan*,
    728 F.3d 111 (2d Cir. 2013) .................................................23

*United States v. Pelletier*,
    898 F.2d 297 (2d Cir.1990) ..................................................14

*United States v. Riley*,
    189 F.3d 802 (9th Cir. 1999) ................................................20

*United States v. Rodrigues*,
    159 F.3d 439 (9th Cir. 1998) *opinion amended on denial of reh'g,* 170
    F.3d 881 (9th Cir. 1999) ......................................................30

*United States v. Roseboro*,
    7 F.3d 642 (4th Cir.1996) ............................................................13

*United States v. Sanchez*,
    176 F.3d 1214 (9th Cir. 1999) ....................................................29

*United States v. Sanchez*,
    635 F.2d 47 (2d Cir. 1980) .........................................................19

*United States v. Truong Dinh Hung*,
    629 F.2d 908 (4th Cir. 1980) ......................................................19

*United States v. Wilson*,
    135 F.3d 291 (4th Cir. 1998) ......................................................30

*United States v. Xiong*,
    262 F.3d 672 (7th Cir. 2001) ......................................................29

*Viereck v. United States*,
    318 U.S. 236 (1943)....................................................................32

## STATUTES

18 U.S.C. § 1958..............................................................................2, 3
18 U.S.C. § 1958(a) ............................................................................1
18 U.S.C. § 3231 .................................................................................1
18 U.S.C. § 3500(b) ..........................................................................18
18 U.S.C. § 3500(e)(1)......................................................................18
28 U.S.C. § 1291 .................................................................................1
28 U.S.C. § 1294 .................................................................................1

## RULES

Fed. R. Crim. P. 26.2(a) ...................................................................18
Fed. R. Crim. P. 52(b).......................................................................21

## CONSTITION

U.S. Const. Amend. V..............................................................21, 24, 25

# STATEMENT OF JURISDICTION

On September 11, 2012 Jose Joaquin Morales was named in a one count indictment charging murder for hire in violation of 18 U.S.C. §1958(a), thereby conferring jurisdiction on the United States District Court pursuant to 18 U.S.C. § 3231.  JA 19.[1]  This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and §1294 over this appeal from conviction and sentence.    Judgment was entered by the United States District Court for the District of Maryland on December 12, 2013.  JA 862-867.  A Notice of Appeal was filed the following day.  JA 868.

# ISSUES PRESENTED FOR REVIEW

I.  Whether Mr. Morales was denied fundamental fairness in violation of the Due Process Clause when the prosecutor was permitted to introduce incriminating statements Morales made to law enforcement pursuant to a proffer agreement?

II.  Was there a Jencks Act violation when an investigator was allowed to testify regarding Morales' statements made during an interview notwithstanding that the investigator had destroyed his notes of that interview, never prepared any report of the interview but had communicated that information to another officer who prepared a report that the investigator never approved and only reviewed years later immediately prior to trial?

---

[1]  "JA" refers to the three volume Joint Appendix contemporaneously filed with this brief.

1

III.    Whether the prosecutor's multiple improper rebuttal arguments, including an inference of guilt from the invocation of his Fifth Amendment right, deprived defendant of a fair trial?

IV.    Whether the cumulative effect of the district court's erroneous evidentiary rulings combined with the government's multiple improper rebuttal remarks denied defendant a fair trial?

## STATEMENT OF THE CASE

*Nature of the Case*

This is a direct appeal from a criminal conviction for one count of using an interstate commerce facility in the commission of a murder for hire in violation of 18 U.S.C. § 1958.[2]  The charge arose from the murder of Robert Long on March 24, 2008.

---

[2] 18 U.S.C.A. § 1958. **Use of interstate commerce facilities in the commission of murder-for-hire**

**(a)** Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

2

*Course of the Proceedings and Disposition Below*

Defendant pleaded not guilty to the indictment. On September 24, 2013, a jury trial was commenced before the Honorable Roger W. Titus. The jury returned a guilty verdict on October 9, 2013. On December 9, 2013 defendant was sentenced to Life imprisonment. JA 863.

## STATEMENT OF RELEVANT FACTS

*Background*

On March 24, 2008 at approximately 9:41 a.m. two gunshots were heard by community service workers who were cleaning up Tracy Atkins Park located in a high crime area in Baltimore City. JA 66, 76-77, 82-83, 112-114. Robert Long was found near the railroad tracks unconscious and not breathing. JA 66. He died a short time later.[3] JA 93. Toxicology reports showed the presence of cocaine and heroin in his body.[4] JA 98-99.

---

[3] The State of Maryland successfully prosecuted Demetrius Smith for the murder. *State v. Smith,* Case No. 108218005.

[4] Long was described by one witness as "[a] severe crackhead" who "could not walk five steps without shaking." JA 586. He had spent the entire night before his murder using drugs with Robert Kemper and Troy Lucas. JA 288-292. Kemper last saw Long shortly before the murder when they parted ways to search for more drugs. JA 298-302. Lucas later told Kemper that he didn't know what happened but suspected that Long "must have run into somebody's backyard and got shot trying to steal something." JA 304.

3

At the time of his death Long had two cases pending in the Baltimore City Circuit Court involving theft of construction equipment. Morales was charged as a codefendant.[5]   JA 357.   Stanley Needleman, a long time Baltimore criminal defense attorney, represented Morales in those theft cases as he had in approximately eight other cases. JA 369-370, 497.  In the summer of 2008, as the theft cases were pending, Morales' bail was revoked in an unrelated matter when he appeared late for court and higher bail was set. JA 563-564.  Needleman paid $30,000 of his own money to a bondsman so that Morales was released on July 24, 2008. JA 563-564, 588-589.

Several weeks later, Morales was arrested at a private airport in Texas attempting to transport six kilograms of cocaine to Baltimore. JA 450-451, 457-458.  Morales made statements at the time of his arrest including that Needleman had funded the cocaine purchase. JA 459, 462-464.  Morales subsequently agreed to be interviewed by Texas and Maryland law enforcement authorities in the hope of obtaining a cooperation agreement. JA 466-468, 473-474.  In addition to providing information about drug contacts in Texas, Morales told authorities that Needleman has a lot of money, that Needleman provided $ 30,000 for his bail

---

[5] Jose Morales owned a small construction business in Baltimore City. JA 203. Long worked with Morales, "almost like a foreman, like [his] right hand man." JA 206.

bond, that Needleman was involved in the cocaine distribution and that he provided funds to purchase the cocaine.  JA 468-469, 489.

At one point the subject matter changed from drugs to a murder.  JA 477. Morales told them about a Baltimore gang called Dead Man, Inc. ("D.M.I."), that Long, his codefendant in a stolen scaffolding case, "snitched," and that Needleman told him not to worry about it. JA 477-480.  Long was subsequently murdered and Needleman told him that D.M.I. "took care of it."[6]  JA 481.  Morales attempted to make consensually recorded telephone calls to Needleman from Texas.   JA 482. He was not permitted to make the calls from his own cell phone, however, and Needleman never answered the calls.  JA  483-484, 488.

Morales entered a guilty plea in Texas without a cooperation agreement.  JA 484.  He was sentenced on March 8, 2010.  JA 485.

While serving his sentence at the United States Penitentiary Canaan in Waymart, Pennsylvania, Morales was interviewed by Assistant United States Attorney Sandra Wilkerson and DEA Agent O'Keefe on October 13, 2010.  JA 414.  AUSA Wilkerson drafted a handwritten letter to Morales stating that the government agreed to "not introduce proffer information directly against you in any criminal trial."  JA 60, 414-415.  It also provided that the government could

---

[6] It was undisputed at trial that Troy Lucas was a DMI member.

5

make derivative use of that information.  Wilkerson, O'Keefe and Morales signed the letter.  JA 60.

O'Keefe returned to interview Morales again the following month.   During that interview he asked a question about the Long murder but Morales denied knowledge of it.  JA 415.   Upon further reflection in January 2011 Morales sent word to O'Keefe that he did know who murdered Long.   Morales was transferred to Baltimore where, pursuant to a "boilerplate" proffer agreement, Wilkerson and O'Keefe interviewed him again.   JA 415.

As a result of information Morales provided about Needleman, federal law enforcement agents executed a search of Needleman's home and recovered $1,200,000.00 in cash.  JA 568.  Needleman was interviewed by the government on July 5, 2011 and agreed to cooperate against Morales.  JA 571-572.  Needleman subsequently pleaded guilty to tax evasion and money structuring. JA 494-495. With Needleman as its key witness, the government prosecuted Morales on a theory that he paid Lucas and his brother Junior to murder Long because Long was cooperating against him in the Baltimore theft cases.  JA 32-35.

*Relevant Trial Evidence*

The defense objected to the testimony of Enrique Pabon, a special investigative officer at USP Canaan.  The defense maintained that his anticipated testimony violated the government's October 13, 2010 proffer agreement to not

6

introduce proffer information directly against Morales at trial.  JA 414.   The government took the position that Morales was not under proffer when O'Keefe subsequently interviewed him at USP Canaan or when Pabon questioned him in January, 2011.  JA 414-415.  The court overruled the defense objection.  JA 415.

Pabon testified that in January 2011, through his staff he received a handwritten note from Morales stating,

> Can you please get in contact with the agent who came up to see me? Please tell him that I can tell him who the two people who killed Rob Long. But I want to be under proffer.

JA 417-418.

O'Keefe was contacted and at O'Keefe's request Pabon agreed to ask Morales some questions. JA 420-422.   Pabon took detailed notes of the questions O'Keefe wanted him to ask Morales and asked Morales those questions.  JA 422-424.

Morales responded by telling him that Long used cocaine but didn't inject it, that Long was shot twice in the head by the railroad tracks, and that Troy and Junior got paid for that.  JA 425-426.  Pabon testified that Morales said Lucas used a small caliber weapon and that he knew this information because Lucas called him minutes after the murder.  JA 426.

Pabon wrote down Morales' responses.  He orally reported the substance of the interview to O'Keefe then shredded his notes because it wasn't his

7

investigation.  JA 422, 436.  Several days later, Agent O'Keefe prepared a formal report that included Morales' statements as reported to him by Pabon as well as his investigation of that information.  JA 21-23.  Pabon relied upon O'Keefe's report at trial, two and a half years later, to refresh his recollection of his interview with Morales.  JA 426, 436-437.

Defendant moved for sanctions on the ground that the intentional destruction of Pabon's notes violated the Jencks Act.  JA 443.  The court ruled that there was no Jencks Act violation because Pabon's notes do not exist and were subsequently incorporated into Agent O'Keefe's report. JA 444-445.

*Rebuttal Argument*

After arguing generally that evidence including "things that came out of Mr. Morales' mouth," established his guilt, JA 840, the prosecutor stated,

> But I want to spend a few minutes talking about what we didn't hear come out of Mr. Morales' mouth … and what we didn't see and what we didn't hear throughout the course of this trial is a shred of remorse or acknowledgment that on March 24, 2008 a man who had worked for him for off and on for 15 years, his foreman, some would say his friend.  That Mr. White told you was his friend, that he felt the slightest bit of tinge of sadness, of hurt, of remorse or anything remotely resembling a friendship with a man who was murdered on March 24th.

JA 841.   The prosecutor went on to suggest that this heartlessness was consistent with defendant's subsequent efforts to "capitalize off the murder of my friend" by attempting to obtain a cooperation agreement with the government because "It's all

8

about Morales.  Mr. Morales. What can I do for me? Well, how can I make this

better for me, for my circumstances?"  JA 842.

Turning next to defense counsel, the prosecutor argued that,

And then [Mr. Zucker] stood up here for 20 minutes and told you how Stanley Needleman was the contractor of Troy Lucas to murder Mr. Long because Mr. Long was going to I guess talk about drug trafficking that Mr. Needleman had been involved in back in August of 2008…Have you heard one shred of evidence that Mr. Needleman was involved in a drug trafficking enterprise such that Mr. Long would have known about it? … [T]hat is the story, the fairy tale that you [are] expect[ed] to believe because that's what Mr. Zucker argued to you for 20 minutes? Did you hear any evidence with regard to Mr. Needleman's involvement in such a way? Is there anything that makes you think that he was involved in a contract murder to the exclusion of Jose Morales and do it as a gift, exchange for a retainer? I mean that is what's frighteningly ludicrous about what happened here this afternoon hearing Mr. Zucker talk about things that aren't even in evidence. There isn't a shred of evidence about that.

JA 844-845.

The prosecutor made a final point referring back to Pabon's testimony and

the note Morales sent indicating that he knew who murdered Long.

[A]fter being sentenced to 22 years in prison and serving his time up there in USP Canaan, he sends that note. And what does he say in that note?  Mr. Clarke showed it to you during his closing argument.  But he says words to the effect of I know the two men that killed Rob Long.  But the most important part. I want to be under proffer.

…

And what it means is that I am going to tell you what happened to Mr. Long, but I don't want you to use my words against me. I want to see if I can get a deal. I want to be under proffer. I want you not to be able to use my words against me. I'll come in and I'll tell you about the

9

murder. But I don't want you to use it against me. Not against me. Because why not against him? Because he did it. He was involved in it. He's the reason that the entire murder happens. He tells them I will tell you what happened. But I, Mr. Morales, I need some protection first.

JA 848-849.

The prosecutor continued arguing that when Agent O'Keefe sent Pabon back to ask Morales certain questions,

Do you know what he's taking down from Mr. Morales? Mr. Morales' confession.

JA 849. Defendant's objection was overruled. JA 849. His motion for mistrial at the conclusion of the argument was denied. JA 859-861.

## SUMMARY OF THE ARGUMENTS

The government violated the October 13, 2010 proffer agreement by introducing Morales' January, 2011 statements about the Long murder directly against him at trial. The October 13, 2010 agreement had no temporal or subject matter limitation. Therefore, it was not limited to statements made on October 13, 2010. The government's position was directly contrary to its presentation to the grand jury on February 16, 2011. At that time, it led Morales through questions that informed the grand jurors that the terms of the agreement applied to the statements Morales made to O'Keefe after October 13, 2010. Accordingly, Morales' post October 13, 2010 communications with O'Keefe including the statements relayed through Pabon were protected. The government's argument to

10

the contrary and the court's ruling denied defendant his right to fundamental fairness under the Due Process Clause.

Alternatively, the District Court erred in failing to strike Pabon's testimony as a sanction for violating the Jencks Act. Pabon's detailed notes of the interview were intentionally destroyed after he reported the substance of the interview to O'Keefe. Pabon, however, never prepared a formal report and didn't review or otherwise "approve" O'Keefe's report. Defendant was prejudiced because Pabon was a critical witness for the government and his statement could not be recreated two and a half years after the fact except by the very witness that the defense sought to impeach.

The government's improper rebuttal argument deprived defendant of a fair trial because one comment penalized his Fifth Amendment right to remain silent by inferring guilt from his request to be "under proffer." Another remark urged bad character reasoning against a non-testifying defendant that was based on an inference from the absence of the very evidence that the government succeeded in dissuading the defense from introducing. Lastly, it twisted defense counsel's actual closing argument into one for which there was no evidentiary support in order to suggest that the defense was deceiving jurors and that the prosecution's view of the evidence was correct. The degree of prejudice to defendant was great because no curative action was taken and the government's case against defendant

11

was far from overwhelming. There was no evidence of the substance of any alleged telephone call between Morales and the hired murderers from which to infer that a telephone was used with the requisite intent that a murder for hire be committed—an essential element of the crime charged. The government's case depended in large part on dubious cooperating witnesses seeking a benefit from the government for their testimony.

To the extent that the foregoing errors are deemed non-reversible their cumulative effect necessarily yielded a denial of the constitutional right to a fair trial. There was a close relationship between Morales' admissions introduced in violation of the proffer agreement and the improper inference of guilt from the request to be under proffer which initiated those statements. Given the absence of any curative action by the District Court, the prejudicial affect of these errors was greater than the sum of the prejudice caused by each individual error.

ARGUMENTS

I.    DEFENDANT WAS DENIED FUNDAMENTAL FAIRNESS
BY TESTIMONY OF GOVERNMENT WITNESS
ENRIQUE PABON

Critical to the government's case against defendant were statements he made to Pabon identifying "Troy" and "Junior" as Long's murderers, the fact that they were paid to do it and that "Troy" had called Morales minutes after the murder. The District Court committed reversible error in permitting the government to

12

introduce those statements directly against defendant at trial in violation of the

October 13, 2010 proffer agreement.   Alternatively, the district court erred in

denying defendant's motion to strike Pabon's testimony as a sanction for violating

the Jencks Act.

A.   *Standards of Review*

Whether a proffer agreement was violated, is a question of law that is

reviewed *de novo*. *United States v. Lopez*, 219 F.3d 343, 346 (4th Cir. 2000).   A

district court's decision regarding the Jencks Act is reviewed for clear error.

*United States v. Roseboro,* 87 F.3d 642, 645 (4th Cir.1996).

B.   *Introduction of Defendant's Statements Breached*
     *the Proffer Agreement Violating Principles*
     *of Due Process and Fundamental Fairness*

Whether Morales' statements to Pabon are protected by the October 13,

2010 proffer agreement, is determined by the terms of the agreement.   See, *United*

*States v. Gillion*, 704 F.3d 284, 292 (4th Cir. 2012) *cert. denied,* 133 S. Ct. 2039,

185 L. Ed. 2d 888 (U.S. 2013).

> The proffer agreement defines the obligations of the parties and is
> intended to protect the defendant against the use of his or her
> statements, **particularly in those situations in which the defendant**
> **has revealed incriminating information and the proffer session**
> **does not mature into a plea agreement or other form of**
> **cooperation agreement.**

*United States v. Lopez*, 219 F.3d 343, 345 n.1 (4th Cir. 2000)(emphasis added);

See also, *U.S. v. Gillion,* 704 F.3d at 292 (same).    Ambiguities are construed

against the government as the drafter of proffer agreements. *Id.; United States v. Hill*, 643 F.3d 807, 876 (11th Cir. 2011). Moreover, because of the unique character of proffer agreements "ordinary contract principles are supplemented with a concern that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause." *United States v. $87,118.00 in U.S. Currency*, 95 F.3d 511, 517 (7th Cir. 1996); *United States v. Pelletier,* 898 F.2d 297, 302 (2d Cir.1990) ("due process requires that the government adhere to the terms of any ... immunity agreement it makes."); See also *United States v. Melvin*, 730 F.3d 29, 39 (1st Cir. 2013).

In *Gillion,* this Court ruled that where "[n]othing in the Agreement before us suggests a temporal limitation," a pre-indictment proffer agreement did not lapse and, therefore, applied to post-indictment statements. *U.S. v. Gillion,* 704 F.3d at 292. As in *Gillion,* the handwritten October, 2010 proffer agreement was unambiguous. It had no temporal or subject matter limitation. Accordingly, the October 13, 2010 agreement did not lapse when the interview ended on that day. Rather it extended to all "proffer information" Morales provided to the government.

The fact that Pabon relayed O'Keefe's questions to Morales and Morales' responses to O'Keefe does not vitiate the government's obligation under the agreement. It is undisputed that Pabon was acting as O'Keefe's conduit and agent.

14

Pabon explained that O'Keefe was four and a half hours away from USP Canaan.
JA 419. He was doing O'Keefe a "favor" to get answers to his questions to save
O'Keefe from having to make the trip. As Pabon stated, "it wasn't my
investigation." JA 435-436. Pabon told Morales that the reason for questioning
him was to give O'Keefe proof that he actually had evidence about who murdered
Long.[7] JA 425. Accordingly, Morales' statements to O'Keefe through Pabon that
were investigated and incorporated into O'Keefe's official report were subject to
the October 13, 2010 proffer agreement.

Contrary to the government's position at trial the prosecution made clear in
the grand jury on February 16, 2011 that all of Morales' communications with
O'Keefe after October 13, 2010 were covered by the terms of that agreement.

> Q. Now I want to go back in time, if you could Mr. Morales. Did there
> come a time when you and I first met at USP Canaan in the fall of 2008—I
> mean, 2010. I'm sorry
> A. Yes.
> Q And did I come to speak with you?
> A. Yes.
> Q. And at that time did you ask me for the same assurances?
> A. Yes.
> Q. In other words, that what you told me I could not use against you
> directly?
> A. Yes.
> Q. Okay. And did I agree and give you the same assurances at that time?
> A. Yes.
> Q. And did you agree to speak with me?

---

[7] O'Keefe investigated the information Morales provided. As stated in his report
he identified Troy and confirmed telephone contact between a phone number
associated with him and Morales on the day prior to the murder. JA 22-23.

A.  Yes.

Q.  And did Agent O'Keefe come and talk to you after that?

A.  Yes

Q.  And again, did he give you the same assurances?

A.  Yes

Q.  And again, those assurances were that we would not use your words against you.

A.  Yes

Q.  But that we would make investigative use, if you will, of the information you provided, correct?

A.  Yes.

Q.  And so all along has that been your understanding of what was happening when you were having conversations with myself, Agent O'Keefe, and now here in the Grand Jury?

A.  Yes.

JA 877-878.

It is clear that the intervening communications between Morales and O'Keefe, with Pabon serving as nothing more than a messenger, were included within the "understanding" of what was protected.  The "assurances" included those communications between Morales and O'Keefe.  The prosecution's strained reconstruction of the "understanding" is an after the fact fabrication to allow them to violate the proffer agreement.

The Government breached the terms of its immunity agreement with Morales and admission at trial of his incriminating statements violated fundamental fairness and due process.  A contrary interpretation would discourage defendants and their counsel from coming forward and giving proffers which like plea agreements serve a vital law enforcement and judicial case management

16

function.   For this reason courts have cautioned "especially when dealing with criminal defendants at proffer sessions, the government must turn square corners." *United States v. Melvin*, 730 F.3d 29, 38 (1st Cir. 2013)(quoting *Ferrara v. United States,* 456 F.3d 278, 280 (1st Cir.2006)).   Here, the government far from squaring the corners cheated by not honoring their commitment under the proffer.

The error was not harmless.  Over objection, Pabon informed the jury that Morales knew that Troy and Junior murdered Long, that they were paid to do so and that Troy called Morales immediately after the murder.  The importance of this evidence was highlighted in the government's closing and characterized in rebuttal as "Morales' confession."[8]   It was the cornerstone of the government's case because it supplied the basis to infer the criminal nature of the otherwise circumstantial telephone contact evidence.   It also buttressed the dubious credibility of the cooperating witnesses relating Morales' alleged confessions.

The erroneous admission of Morales' statements violated his due process right to fundamental fairness.   Standing alone or in combination with other errors in this case, Morales' conviction must be reversed.

---

[8] The Supreme Court has recognized that a defendant's own words are "'probably the most probative and damaging evidence that can be admitted.'" *Arizona v. Fulminante,* 499 U.S. 279, 296 (1991).

17

C.   *Alternatively, the District Court Clearly Erred*
     *in Failing to Strike Pabon's Testimony As a Sanction for*
     *Violating the Jencks Act By Destroying His Detailed Notes*

The Jencks Act requires the Government to produce statements of the testifying witness that relate to the subject matter of a witness's direct examination.[9] *See* 18 U.S.C. § 3500(b); *see also* Fed.R.Crim.P. 26.2(a).   A "statement" includes a written statement made by the witness and adopted or approved by him. 18 U.S.C. § 3500(e)(1).   In this jurisdiction rough interim notes of a government agent, when later incorporated into ***that*** agent's formal interview report, need not be produced under the Act.  *United States v. Hinton*, 719 F.2d 711, 717 (4th Cir. 1983).  This court reasoned that once the notes have been transferred to the formal report

> it is the formal report which becomes in such circumstances the "approved" statement required under the Act to be preserved and to be producible on demand.

*United States v. Hinton*, 719 F.2d 711, 717-18 (4th Cir. 1983).

Pabon testified, however, that he did not prepare a formal interview report of his conversation with Morales.  JA 435.  Where, as here, notes of one agent are incorporated by another agent into a report, that report may omit useful

---

[9] Because Pabon testified on direct about his interview of Morales, his detailed notes of that interview clearly related to the subject matter of his testimony. *United States v. Derrick,* 507 F.2d 868, 871 (4th Cir.1974)(A statement relates to the subject matter of trial testimony if it "relate[s] generally to the events and activities" to which the witness testified.)

information; or such information as is incorporated may be colored by the agent's interpretation. *United States v. Sanchez*, 635 F.2d 47, 66 (2d Cir. 1980).

Moreover, Pabon did not review O'Keefe's report until trial, two and a half years later when he could only testify that the report was accurate to the best of his recollection. JA 436-437. Under such circumstances it cannot be considered that Pabon ever "approved" O'Keefe's formal report as his own statement.

Pabon's detailed notes were a complete record of his interview including both the questions he asked and Morales' responses. JA 421, 853. The Jencks Act dictates that defendant should have had access to Pabon's notes, not O'Keefe's interpretation of them. Accordingly, the District Court clearly erred in determining that defendant was not entitled to Pabon's notes for impeachment purposes because O'Keefe had incorporated them into his report.

The district court also erred in excusing the government's failure to produce Pabon's notes because they no longer existed. It is well established that the destruction of Jencks Act material may violate the spirit of the Act, even if the material is destroyed without bad faith. *United States v. Truong Dinh Hung*, 629 F.2d 908, 921 (4th Cir. 1980); See also, *United States v. Carrasco*, 537 F.2d 372, 377 (9th Cir. 1976)("The Jencks Act is no less violated by the destruction of a statement than by its non-production. To hold otherwise would create an exception as broad as the Act itself.") This court has held that "[a] violation of the Jencks

19

Act should be excused only where it is perfectly clear that the defense was not prejudiced." *United States v. Crowell*, 586 F.2d 1020, 1028 (4th Cir. 1978).

Prejudice has been recognized where, as here, the destroyed statement was that of a key government witness and it was impossible to discover the contents of the destroyed document except by using the very witness whose testimony the defendant sought to impeach. *U.S. v. Carrasco*, 537 F.2d at 377-378; *United States v. Riley*, 189 F.3d 802, 806 (9th Cir. 1999). Pabon was a critical government witness. The government characterized in rebuttal argument his testimony as evidence of "Morales' confession." JA 849. Prejudice from the destruction of the only evidence that could be used to test Pabon's recollection and undermine his credibility about the details of that interview occurring more than two years earlier renders the prejudice high. Accordingly, the district court erred in failing to exercise its discretion to consider sanctions for the government's intentional destruction of Pabon's Jencks statement.

## II.  IMPROPER REBUTTAL ARGUMENTS DENIED DEFENDANT A FAIR TRIAL

This is not a case where the prosecutor made a single misstatement in rebuttal argument. Rather, the prosecutor made three impermissible comments, each escalating from the last which substantially prejudiced defendant's right to a fair trial.

20

A.    *Legal Standards*

Whether a statement made in closing arguments has unconstitutionally tainted the outcome of the case is a question of law, which is reviewed *de novo*. *United States v. Collins,* 415 F.3d 304, 307 (4th Cir.2005).    In this Circuit "the test for reversible prosecutorial misconduct generally has two components: that '(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.' " *Id.* at 240.  Where no objection to a comment was made, a new trial is required if the prosecutor's improper conduct constituted plain error under Fed R. Crim. P. 52(b).  *United States v. Mitchell*, 1 F.3d 235, 239 (4th Cir. 1993).

B.    *Arguments Were Improper*

1.    *Implying Guilt from Defendant's Request to be "Under Proffer" Penalized His Fifth Amendment Right to Remain Silent*

The Fifth Amendment to the Constitution[10] guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will and to suffer no penalty … for such silence." *Mallory v. Hogan,* 378 U.S. 1, 8 (1964).  This Amendment not only affords individuals the right to remain silent but also bars prosecutors from commenting on a criminal defendant's exercise of

---

[10] The Fifth Amendment guarantees that "[n]o person …shall be compelled in any criminal case to be a witness against himself." US CONST, Amdt V.

that right. *Griffin v. California,* 380 U.S. 609, 614-615 (1965). The *Griffin* Court reasoned that such comments, and any adverse inferences drawn from them, are a "penalty" imposed on the defendant's exercise of the privilege. *Id.*

Neither this circuit nor the Supreme Court have squarely addressed whether *Griffin's* holding extends to prohibit the government from commenting on a non-testifying defendant's non-custodial, pre-arrest exercise of the Fifth Amendment right. Although the Supreme Court granted *certiorari* last term to address that question, a plurality of the Court decided the case without reaching that issue. *Salinas v. Texas,* ___U.S.___, 133 S.Ct. 2174 (2013). Justice Alito joined by Chief Justice Roberts and Justice Kennedy, denied Salinas' Fifth Amendment claim on the ground that he had merely fell silent during questioning and had not *expressly* invoked the privilege against self-incrimination. Justice Alito explained that in a non-custodial, pre-arrest situation, Salinas was required to put the Government on notice when he intended to rely on the privilege in order to ensure "that it may either argue that the testimony sought could not be self-incriminating, or cure any potential self-incrimination through a grant of immunity.[11] *Id.* at 2179 (internal citations omitted).

---

[11] Justices Scalia and Thomas concurred in the judgment but would have answered the constitutional question the Court agreed to hear and declare that the government could use Salinas' silence at trial even if he had claimed a Fifth Amendment right. *Id.* at 2184-2185.

22

The four dissenting Justices were of the opinion that "the Fifth Amendment prohibits a prosecutor from commenting on Salinas's silence." *Id.* at 2191. (J. Breyer, dissent). They would have ruled that courts should examine the specific circumstances of an individual's encounter with police to decide whether, in fact, that person's silence was an attempt to claim the Fifth Amendment right.

Unlike the defendant in *Salinas,* who did not expressly invoke his Fifth Amendment privilege, Morales did so by stating that he wanted to be under proffer. It is well established that "no ritualistic formula is necessary in order to invoke the privilege." *Quinn v. United States,* 349 U.S. 155, 164 (1955); *Hoffman v. United States,* 341 U.S. 479, 486 (1951)(The invocation of the privilege against self-incrimination must be given a liberal construction). Accordingly, a defendant's request for a lawyer has been held to successfully assert the privilege. *United States v. Okatan,* 728 F.3d 111, 116 (2d Cir. 2013). Morales' request to be "under proffer" is at the minimum, the functional equivalent of a request for a lawyer. Both requests clearly put the government on notice of an intention to rely on the privilege against self-incrimination.

Consistent with the reasoning of seven Supreme Court Justices, Fifth Amendment violations have previously been found, when as here, the government uses a defendant's pre-arrest assertion of rights against him at trial. *See Combs v. Coyle,* 205 F.3d 269, 286 (6th Cir.2000) *cert. denied, Bagley v. Combs,* 531 U.S.

23

1035 (2000); *United States v. Burson,* 952 F.2d 1196, 1201 (10th Cir.1991) *cert. denied,* 503 U.S. 997(1992); *Coppola v. Powell,* 878 F.2d 1562, 1568 (1st Cir.1989) *cert. denied,* 493 U.S. 969 (1989); *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1017–18 (7th Cir.1987).

In *Combs,* the Sixth Circuit analyzed the prosecution's use of the defendant's pre-arrest statement that the police officer needed to "talk to my lawyer" as a comment on pre-arrest silence. *Combs v. Coyle,* 205 F.3d at 279. The court held that the prosecution's use of that evidence was improper under the Fifth Amendment. *Id.* at 283. In doing so, it reasoned that government compulsion to speak occurs not only when one is taken into custody to be questioned or after the provision of *Miranda* warnings; it also occurs when the State uses at trial a defendant's choice to remain silent to imply guilt. *Id.* at 285 ("[T]he violation of the Fifth Amendment occurred not when the defendant remained silent, but when that silence was later used against him at his criminal trial.").

In *Lane*, the government presented evidence that defendant, a friend of one of two teenagers brutally murdered, told police that he didn't want to talk to them or give a statement when they first sought to interview him as a witness. *U.S. ex rel. Savory v. Lane*, 832 F.2d at 1015. In closing argument, the prosecutor emphasized that statement and implied defendant's guilt because he didn't want to help the police investigate the murder of his good friend. *Id.* at 1018. The court

24

ruled that the government's use of the evidence to imply guilt violated defendant's constitutional right to remain silent. *Id.*

Similarly here, the Fifth Amendment violation occurred not when Morales wrote the note and put the Government on notice of his intention to remain silent about Long's murder unless granted proffer immunity, but when that assertion was used at his criminal trial to imply his guilt. Just as the prosecutor asked the jury in *Combs* to infer guilt from the defendant's "talk to my lawyer" comment and in *Lane* from defendant's statement that he didn't want to talk to police about the murder, the prosecutor in this case asked the jury to infer guilt because Morales wanted "some protection" before telling them who murdered Long.

Regardless of whether Morales subsequently provided information about Long's murder or remained silent, it was the assertion of his right by requesting proffer immunity that was improperly used against him at trial. When the government in rebuttal urged the jurors to infer guilt because he wanted to be under proffer, it penalized his right to remain silent in violation of the Fifth Amendment.

    2.    *Inflammatory Character Argument Based on the Absence of Evidence that the Government Had Dissuaded the Defense From Introducing Was Plainly Improper*

The prosecutor's "It's all about Morales" argument was not a comment on assertions made by the defense in closing argument. Nor was it a comment on the

25

absence of evidence supporting the defense theory. Rather, it improperly sought to prejudice jurors against defendant and did so by attributing to him a bad character trait based on the absence of evidence that the prosecutor knew existed.

The prosecutor urged the jurors to infer that defendant lacked any compassion or remorse for Long's death from the absence of the very evidence that the government dissuaded the defense from introducing. The prosecutor had specifically requested the court to preclude the defense from eliciting from Harry White a conversation within hours of the murder in which White "told Mr. Morales that Long was dead, to which Mr. Morales began crying and became upset." JA 100, 104-105. The government maintained that such evidence would violate the proffer agreement because it was "materially different" than the proffer information in which Morales admitted his involvement in the murder for hire scheme. JA 104-111. Reasoning that the evidence would negate his guilt in the sense that if he were involved in the murder he would not be sad, the court ruled "I'm not going to exclude it because of your contract" but if it is elicited and the government raises the issue,

> I would have to address the question and permit the government to put the proffer statement in at the appropriate time.

JA 115-117. In light of the government's position and the court's ruling that introduction of the referenced evidence would "open the door" to introduction of the proffer statement, defense counsel reasonably chose not to introduce the

26

evidence.  JA 108, 117.   The government's argument that there was no evidence Morales expressed sadness or acknowledged his friend's death was disingenuous.[12] It was a deliberate deception; the prosecution successfully precluded the defense from introducing the evidence, than asked the jurors to infer Morales guilt based on the lack of any demonstrable grief by him.

This argument also plainly sought to evoke personal prejudice based on the bad character of a non-testifying defendant whose character was not at issue. Federal Rule of Evidence 404(a) excludes proof of a person's bad character not because it has no probative value, but because it sometimes may lead a jury to convict the accused on the ground of bad character deserving punishment irrespective of guilt. *United States v. Anderson,* 933 F.2d 1261, 1268 (5th Cir.1991); *Michelson v. United States,* 335 U.S. 469, 476 (1948)(bad character evidence "weigh[s] too much with the jury and ... overpersuade[s] them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge").

In the same way, a prosecutor's argument that characterizes a defendant in the most despicable manner creates a high risk of prejudice.  *United States v. Mendoza,* 522 F.3d 482, 495 (5th Cir. 2008).  By disparaging Morales as a

---

[12] See, *United States v. Earle,* 375 F.3d 1159, 1165 (D.C. Cir. 2004)(improper argument where prosecutor sought an inference that was contrary to pre-trial representations defense counsel made to the district court that neither the court nor the prosecutor ever questioned).

27

heartless, selfish and uncompassionate person who not only never expressed sadness over the death of his friend but also attempted to capitalize off it, the argument was plainly improper.

### 3. Falsely Disparaging Defense Counsel For Making an Improper Argument Misled The Jury

In purporting to respond to a portion of defense counsel's extended argument about why Needleman should not be credited, the prosecutor improperly twisted defense counsel's words into a strawman and battered it to pieces as a "fairy tale" because "[t]here isn't a shred of evidence about that."   JA 844-845.

Focusing on Needleman's admission that the biggest mistake of his life was paying $30,000 to bail Morales out of jail, counsel argued that was so because it revealed their true relationship was not merely attorney-client as Needleman portrayed but they were partners in crime as Morales had told Texas authorities. JA 811.  Counsel suggested that one of the reasons Needleman paid Morales' bail was because he, as a seasoned criminal defense attorney, knew what happens when people are incarcerated.  "They cooperate."

> Was he worried that Jose would disclose … this drug business dealing that they were in together… Or was he also worried that Morales would tell on the other part of Needleman's activities? Rob Long. See because when he was arrested in Texas, in addition to talking about Stanley Needleman and drugs, he talked about Stanley Needleman and the elimination of Rob Long as a witness.... If Rob Long is successful in testifying against Jose Morales and gets Jose Morales convicted and Jose Morales is trying to get out of prison, trying to do

28

exactly what he did try to do, what Needleman has done, what Stokes has done, what Ray has done, tried to go on somebody else. Who is he going to go on? He's going to cooperate against Needleman. So Stan Needleman in order to protect Jose Morales has all the same motive to eliminate Rob Long if he in fact was going to be a potential witness.

JA 811-812.

Contrary to the prosecutor's argument[13] defense counsel never even remotely suggested that Needleman was concerned that Long was cooperating against him or that Long knew anything about Needleman's involvement in the drug business.  At no point did counsel suggest that Needleman was involved in the murder for hire as a "gift, exchange for a retainer" or that Needleman was the contractor of Lucas "to the exclusion of Morales" as the prosecutor maintained. JA 845.

The prosecutor's argument was misleading because it falsely accused defense counsel of trying to deceive them by arguing facts not in evidence.  See, *United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001)(disparaging remarks directed at defense counsel are "reprehensible"); *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (prosecutorial misconduct by denigrating the defense as a sham in closing argument).

The representative of the United States does not speak as a mere partisan. He speaks on behalf of a government interested in doing justice. When he says the defendant's counsel is responsible for lying and deceiving, his accusations cannot fail to leave an imprint on the

---

[13] P. 9, *supra.*

29

jurors' minds. And when no rebuke of such false accusations is made by the court, when no response is allowed the vilified lawyer, when no curative instruction is given, the jurors must necessarily think that the false accusations had a basis in fact. The trial process is distorted.

*United States v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998) *opinion amended on denial of reh'g,* 170 F.3d 881 (9th Cir. 1999).   Accordingly, the prosecutor's argument was plainly improper.

C.     *Improper Rebuttal Arguments Prejudicially Affected Defendant's Substantial Rights And Deprived Him of a Fair Trial*

In *Wilson,* this court identified several factors that are relevant to the determination of whether the defendant's substantial rights were prejudiced to the point of being denied a fair trial, including:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused;
> (2) whether the remarks were isolated or extensive;
> (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused;
> (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters;
> (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel, and
> (6) whether curative instructions were given to the jury.

*United States v. Wilson,* 135 F.3d 291, 299 (4th Cir. 1998).

The degree to which the prosecutor's remarks misled the jury and prejudiced defendant was great.   The error in referring to defendant's invocation of his right to remain silent is of constitutional magnitude.   Similarly, the prosecution's lack of

remorse comment, in addition to encouraging highly prejudicial bad character reasoning,[14] called into question evidence not before the jury, which implicates defendant's Sixth Amendment rights.    Separate prejudice from the "fairy tale" argument misled jurors to believe that the defense counsel's characterization of the evidence should not be trusted and that a finding of not guilty would, therefore, conflict with the true facts of the case.    These arguments individually were powerful enough to influence the jury to render a conviction on grounds beyond the admissible evidence.

Within the confines of rebuttal argument the misconduct was extensive.  It was made when it would have the greatest impact on the jury.    The court's instructions had already been given and defense counsel had no opportunity to respond, thereby enhancing its impression on the jury.    This strategic use of improper arguments having a strong tendency to mislead the jurors makes this case exceptional and likely to have affected the jury's decision.

To prove its case that defendant was involved in a five year old murder for hire, the prosecution introduced circumstantial evidence that Lucas murdered Long, disputed circumstantial evidence of cell phone contacts between defendant's phone and various phones associated with Lucas and his extended family but no

---

[14] The risk of unfair prejudice is "substantial" when evidence or argument is "arresting enough to lure a juror into a sequence of bad character reasoning." *Old Chief v. United States,* 519 U.S. 172, 185 (1997).

evidence of the substance of those conversations and testimony of three cooperating witnesses seeking a benefit from the government whose credibility was strenuously challenged.  The prosecution's case, while strong enough to overcome the minimal standard of a sufficiency challenge, was far from overwhelming.

The prosecution's deliberate use of highly prejudicial and inflammatory arguments diverted the jury's attention to extraneous matters.  The lack of remorse argument placed before the jury a powerful character consideration that is properly reserved for sentencing but improper at trial.  See, *United States v. Caro*, 597 F.3d 608, 629-30 (4th Cir. 2010)(remorse pertains to character rather than to circumstances of criminal conduct which the court is required to consider at sentencing).  The prosecution's "fairy tale" argument induced the jury to give greater weight to its view of Needleman's credibility by improperly disparaging the defense argument regarding Needleman's lack of credibility.

No curative instruction was given.  To the contrary, the court overruled the defense objection to one argument and denied his motion for mistrial.  With respect to the other two plainly improper arguments the judge, at a minimum, could have interrupted the prosecutor's argument and admonished her for improper remarks.  *See Viereck v. United States,* 318 U.S. 236, 248 (1943)(observing that trial judge may *sua sponte* interrupt argument and admonish attorney for improper

32

comment).   Although the court's standard instruction informed the jury that arguments of counsel are not evidence, the danger here was not so much that the jury would consider the prosecutor's statements to be "evidence."   Rather, the threat was that the prosecutor's remarks would excite the jury, invite a partisan response, and distract its attention from the *only* issue properly presented byt his case:  whether the defendant used a cell phone with the intent that a murder for hire be committed.

All of these factors lead to the conclusion that the government's rebuttal arguments affected defendant's substantial rights and impugned the fairness, integrity and public reputation of the judicial proceedings, because they unfairly stacked the deck against defendant in favor of the government.   Because the improper remarks affected defendant's substantial right, this Court should reverse his convictions and remand for a new trial.

### III.     CUMULATIVE EFFECT OF ERRONEOUS EVIDENTIARY RULINGS AND IMPROPER REBUTTAL ARGUMENTS DENIED DEFENDANT A FAIR TRIAL

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136 (1955).  The cumulative error doctrine provides that an aggregation of non-reversible errors can yield a denial of the constitutional right to a fair trial, which calls for reversal.  *United States v. Baker,* 432 F.3d 1189, 1223

(11th Cir. 2005); *United States v. Martinez,* 277 F.3d 517, 532–34 (4th Cir.2002)(applying the cumulative error doctrine in the criminal context).

As noted above the court and the prosecution made several grave errors. The Supreme Court has long recognized that,

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United States,* 295 U.S. 78, 88 (1935).  Accordingly, it is the duty of the prosecutor as well as the trial court to prevent the appearance and reality of unfairness.  *United States v. Godwin*, 272 F.3d 659, 672 (4th Cir. 2001).

That did not happen in this case which led to the introduction of defendant's incriminating statements in violation of the proffer agreement and improper argument that penalized defendant's assertion of Fifth Amendment rights.  The combination of these errors and the two additional highly inflammatory rebuttal remarks infected the proceedings so as to render the trial fundamentally unfair.  Accordingly, a new trial is warranted.

## CONCLUSION

Based on the foregoing, appellant respectfully requests that the court reverse the judgment and remand for a new trial.

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument in this matter, as such argument will enable the parties to better explain their positions.

Respectfully submitted,


/s/_____
Jonathan Zucker
1350 Connecticut Avenue, NW
Suite 202
Washington, DC  20036
(202) 624-0784
jonathanzucker@aol.com

Counsel for Appellant
(Appointed by the Court)

CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief has been prepared with Word, using a proportionally spaced serif typeface, Times New Roman, 14 point font.

2. Exclusive of: table of contents; table of authorities; any addendum containing statutes, rules, or regulations; and the certificate of service this brief contains <u>8,259</u> words.

3. I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or copy of the word or line printout.

/s/_____

Jonathan Zucker
1350 Connecticut Avenue, NW
Suite 202
Washington, DC  20036
(202) 624-0784
jonathanzucker@aol.com

Counsel for Appellant
(Appointed by the Court)

CERTIFICATE OF FILING AND SERVICE

On the 16th day of June, 2014, I filed the required copies of the foregoing

OPENING BRIEF OF APPELLANT with the Clerk of Court via hand delivery

and electronically using the CM/ECF system, which will send a notice of

electronic filing to:

Sandra Wilkinson
Martin J. Clarke
OFFICE OF THE UNITED
STATES ATTORNEY
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4800 Telephone
sandra.wilkinson@usdoj.gov
marty.clarke@usdoj.gov

Counsel for Appellee

/s/_____
Jonathan Zucker
1350 Connecticut Avenue, NW
Suite 202
Washington, DC  20036
(202) 624-0784
jonathanzucker@aol.com

Counsel for Appellant
(Appointed by the Court)

37